## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARK ANTHONY CARTER

*Plaintiff,*

vs.

Case No. 16-01350-EFM

SPIRIT AEROSYSTEMS, INC.,

*Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Mark Anthony Carter is a former employee of Defendant Spirit AeroSystems, Inc. ("Spirit").  Carter, proceeding pro se, alleges that Spirit discriminated against him in violation of the Americans with Disabilities Act ("ADA") and interfered with his rights under the Family Medical Leave Act ("FMLA").  Carter also alleges that Spirit retaliated against him for filing a charge with the Equal Employment Opportunity Commission ("EEOC"), filing a workers' compensation claim, and taking FMLA leave.  This matter comes before the Court on the parties' respective motions for summary judgment, as well as Carter's motion for the Court to reconsider an order denying his request to file a surreply.  For the following reasons, the Court grants Spirit's Motion for Summary Judgment (Doc. 149) and denies Carter's Cross-Motion for Summary Judgment (Doc. 166) and Motion for Reconsideration (Doc. 165).

# I.    Factual and Procedural Background

## A.    Local Rules for Summary Judgment

In addition to the Federal Rules of Civil Procedure, the District of Kansas Local Rules set forth specific requirements for summary judgment motions.   Under D. Kan. Rule 56.1, a memorandum in support of a motion for summary judgment "must begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists."[1]  Furthermore, "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."[2]  The rule further states that:

> A memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists.   Each fact in dispute must be numbered by paragraph, *refer with particularity to those portions of the record upon which the opposing party relies*, and if applicable, state the number of movant's fact that is disputed.[3]

Carter is proceeding *pro se*, and the Court must afford him some leniency in his filings.[4]  A *pro se* litigant, however, is still expected to "follow the same rules of procedure that govern other litigants."[5]  Here, Spirit's statement of facts contained 69 paragraphs of facts with citations to the record.   Carter's Response opposing summary judgment states that 32 of Spirit's paragraphs are uncontroverted, and Carter attempts to controvert the remaining 37 paragraphs.   Carter's

---

[1] D. Kan. Rule 56.1(a).

[2] D. Kan. Rule 56.1(a).

[3] D. Kan. Rule 56.1(b)(1) (emphasis added).

[4] *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007).

[5] *Id.*

Response, however, fails to controvert Spirit's facts with specific citations to the record.[6] Similarly, Carter's Cross-Motion for Summary Judgment not only omits citations to the record, it provides no statement of facts at all for the Court's consideration. The Court will not scour the record on Carter's behalf to seek evidence contradicting Spirit's statement of facts.[7] Instead, the Court holds that Carter has failed to adequately controvert any of Spirit's facts, and Spirit's facts are deemed admitted for purposes of summary judgment.

## B.  Facts

Spirit designs and builds parts and components for commercial aircraft. In 2011, Spirit hired Carter as an Assembly Mechanic–Underwing in its Wichita, Kansas facility to work on the strut assemblies on the Boeing 777 line. When he was first hired, Carter worked in the second shift position, but Carter eventually moved to the first shift position, which begins its shift at 6:30 a.m.

Carter suffers from intense migraines. Carter describes his migraines as being debilitating to the point where he "cannot physically do anything." Instead, Carter's migraines leave him "laying in bed screaming for hours" or even "the whole day." From 2012 until he was fired in 2015, Carter applied and was approved for several intermittent or continuous FMLA leaves of absence; Carter took some of the leaves of absence to care for his sick wife and others were to address his own health conditions.[8]

---

[6] Carter states his reasons for disagreeing with Spirit's statement of facts, but he does not cite to evidence of record. A large portion of Carter's attempts to controvert Spirit's facts merely challenges the credibility of Spirit's evidence. The Court does not weigh credibility of the evidence at the summary judgment stage.

[7] *Oakview Treatment Centers of Kansas, Inc. v. Garrett*, 53 F. Supp. 2d 1184, 1193, n. 8 (D. Kan. 1999).

[8] In addition to requesting several FMLA leaves of absence, Carter filed a claim for workers' compensation for a shoulder injury in October 2013. Spirit accommodated Carter's injury with light-duty and workplace modifications.

Spirit's General Leave of Absence policy, OP3-177, informs employees of the procedure they must follow to request and report leave under the FMLA. To have leave approved under the FMLA, the employee must notify Spirit's Benefits Center within three days of the absence. OP3-177 also states that "Employees must report absences and/or late arrivals in accordance with Spirit's OP3-178 *Attendance and Punctuality* procedure" and that "[n]othing in this procedure is intended to relieve an employee's responsibility to notify management or the Absence Reporting Line . . . of unscheduled absences and/or late arrivals in accordance with OP3-178."

Spirit's Attendance and Punctuality procedure, OP3-178, states:

> In the event an unexpected circumstance arises that will cause the employee to be late for work or absent, the employee must notify his/her manager within the first thirty (30) minutes of their shift. Failure to follow these requirements may result in disciplinary action, up to and including termination.

OP3-178 states that its guidelines "apply to all Spirit AeroSystems employees at the Wichita, Kinston, Tulsa, and McAlester sites." Additionally, it states that all "[a]ttendance guidelines affecting employees represented by a collective bargaining unit will be administered in accordance with the terms of the collective bargaining agreement." Carter is represented by a collective bargaining unit, International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM"). The collective bargaining agreement between Spirit and IAM does not contain a section regarding employees' obligations to timely report to managers any unforeseen absences or tardiness. Section 11.4(C)(1) of the CBA does address how employees may use sick leave, stating:

> Between eligibility dates, an employee, including an employee on a leave of absence, may, at his option, use any part or all of his Sick Leave Credit as sick leave providing: (A) the employee is partially or wholly incapacitated by actual illness or injury on the days taken as sick leave, (B) an illness in the employee's immediate family requires the employee's presence or (C) the employee has a medical or dental appointment which can be scheduled only during working hours. The employee shall be paid for absence charged to sick leave and shall not be penalized for such absence providing the nature of the absence and anticipated length of

absence is reported to his organization on the first day of such absence, or as soon thereafter as reasonably possible. As to possible rights after exhaustion of Sick Leave Credit, see Section 11.4(B.5).

Jeffry Black, who worked in Spirit's Labor Relations division in 2014–2015, states in a sworn declaration that Section 11.4(C) "applies only to situations where the employee opts to use sick leave and wants to be paid for the absence." Black states that "[t]he 'notice of sick leave' provision in Section 11.4(C) is entirely separate and distinct from the manager notification procedure outlined in [OP3-178]." Additionally, Black states that in May 2015, Spirit and IAM entered into a Memorandum of Understanding ("MOA") confirming that Section 11.4(C)(1) "was intended to cover use of sick leave credit, and that employees were still subject to discipline for failing to follow the manager notification procedure, even if they covered an absence with sick leave credit."

Under Spirit's Disciplinary Guidelines, OP3-179, an employee who violates Spirit's manager-notification policy is typically given a documented verbal warning; thereafter, the employee can receive a written warning, suspension, or termination for subsequent violations. Spirit has a separate disciplinary process for employees who engage in "personal misconduct"— for example, violating the manager-notification policy—and employees who violate Spirit's attendance policy with excessive absences. An employee who violates Spirit's "personal misconduct" policies receives a Disciplinary Action Form outlining the area of concern and the level of discipline. In contrast, an employee who is excessively absent receives an Attendance Disciplinary Memo.

Spirit provides sworn declarations from three Spirit employees addressing the importance of Spirit's manager-notification policy. Laura Breese, a Human Resources manager, stated that "[t]he manager notification procedure ensures that first-level managers know at the beginning of

the work day who will and will not be present for work." Lauri Myers, a second-level supervisor, and Dustin Valentine, a first-level supervisor, both stated that for Spirit to meet its production deadlines, it is critical for managers to know which employees will be present on any given day. Additionally, from 2014–2015, Spirit issued over 240 disciplinary actions to nearly 200 different employees for failure to follow the manager-notification procedure. Twenty of these employees were on approved FMLA leave on at least one of the dates on their discipline form.

On December 9, 2014, Spirit gave Carter a documented verbal warning for personal misconduct. The Disciplinary Action Form stated that Carter failed to notify his manager within 30 minutes of his shift that he would be late or absent on four separate occasions. The form stated that Carter "must adhere to all company policies, procedures, and management directives including notifying management within the first thirty minutes of [Carter's] shift if [he is] going to be late or absent." The form then stated that "[f]uture incidents of this nature may result in further disciplinary action up to and including termination." Three of the four days Carter was absent, he was on approved intermittent FMLA leave to care for his wife and for his own non-work injury to his hand. Carter never received an Attendance Disciplinary Memo for the absences themselves; rather, he was disciplined solely for his failure to timely notify his managers that he would miss work.

On January 19, 2015, Carter received a written warning for failing to timely notify his manager within 30 minutes of his shift that he would be absent on two dates in December. Then, on February 9, 2015, Carter received another Disciplinary Action Form for failing to timely notify his manager that he would be absent three times in January 2015. Carter received a three-day unpaid suspension for these violations. Once again, the form explained that Carter needed to comply with the manager-notification policy and that future violations would lead to additional

discipline, including possible termination. Carter was on approved intermittent FMLA leave for his migraines on each of the five days he was absent. As before, Carter did not receive any discipline for the absences themselves; his discipline was for not timely notifying his manager that he would be absent.

On February 13, 2015, Carter met with Laura Breese—who at the time was a Human Resources Generalist supporting Spirit's Wichita facility—and representatives from Carter's union, IAM. At this meeting, Carter expressed concern about the wording in Spirit's Attendance and Punctuality policy (OP3-178) and Disciplinary Guidelines (OP3-179) and asserted that he did not believe he needed to comply with Spirit's manager-notification policy if his absences were approved FMLA leave. Breese and the IAM representatives reiterated to Carter that he was required to follow Spirit's manager-notification policy regardless of whether the absences were excused under the FMLA. After Carter explained that his migraines interfered with his ability to notify his managers, Breese recommended several possible accommodations that would allow Carter to comply with the policy, including having a family member call his manager on his behalf. Carter replied that these options would be generally ineffective. Breese asked Carter what accommodation would allow compliance with the manager-notification policy, and Carter was unable to identify any such accommodation.

On February 19, 2015, Carter left work in the middle of a shift without notifying his manager. Because Carter had received progressive discipline for personal misconduct, Carter's mid-shift departure would have been grounds for Spirit terminating his employment. Spirit, however, agreed not to discipline Carter for this incident.

In April 2015, Carter provided Spirit with a note from his doctor stating that Carter's migraines interfered with his ability to attend work and comply with the manager-notification

policy.  In response to this note, Breese and another representative from Spirit's Human Resources Department held another meeting with Carter.  Breese and the HR representative informed Carter that he was still not exempt from Spirit's manager-notification policy, and they recommended three possible accommodations.  Breese first suggested that Carter have a family member act as a proxy and contact Carter's manager on his behalf; Carter explained that this plan would not be a reliable option based on his current family circumstances.  Breese also suggested that Carter type out a text message to his manager on his cell phone the night before a shift and lower the brightness on his phone; then, if Carter had a migraine the following morning, he could notify his manager by simply opening his phone and pressing send.  Carter stated he was unable to look at his phone during a migraine episode for any amount of time even with the brightness on his cell phone turned down.  Finally, Breese suggested that he alert his manager the night before a shift if he thought a migraine might be forthcoming.  Carter replied that his migraines came quickly without warning symptoms, so this would not be an effective solution.  At the end of this meeting, Breese asked Carter to provide a recommended accommodation, and Carter could provide none.

On June 11, 2015, Carter received additional discipline for failing to timely notify his manager on two occasions that he would be late or absent.  Rather than firing Carter, Spirit gave him a second three-day suspension.  Carter was informed, however, that his employment would be terminated if he received any additional discipline in the next 12 months.  On June 22, Carter once again failed to comply with the manager-notification procedure.  On July 21, Spirit fired Carter.

Before bringing this suit, Carter filed two charges of discrimination against Spirit with the EEOC.  Carter's first charge was filed in October 2014, while he was still employed by Spirit.  In his first charge, Carter alleged that Spirit discriminated against him due to his race by giving

preferential treatment to Asian employees. Carter also stated that after he complained about this unfair treatment to his union, Spirit started harassing him about unrelated matters, including Carter taking FMLA leave and filing a workers' compensation claim. On May 6, 2015, the EEOC dismissed Carter's charge and issued him a right-to-sue letter. Even though the EEOC's letter explained that Carter had 90 days to file suit, Carter waited over a year before filing this lawsuit. Accordingly, this Court granted Spirit's motion to dismiss all claims relating to Carter's 2014 EEOC charge.[9] Carter filed his second EEOC charge on March 30, 2016. In his second EEOC charge, Carter stated that he was disciplined, suspended, and discharged because of his disability in violation of the ADA and in retaliation for filing his 2014 EEOC charge. The only two instances discussed in Carter's 2016 EEOC charge are his second suspension on June 11, 2015, and his termination on July 21, 2015.

Carter filed this lawsuit on September 9, 2016. In addition to seeking damages against Spirit, Carter filed suit against his union (IAM), Spirit's legal counsel (Foulston Siefkin LLP), and the United States Department of Labor. IAM, Foulston Siefkin, and the Department of Labor have since been dismissed from this case. On February 1, 2019, Spirit filed a Motion for Summary Judgment on Carter's remaining claims. After Spirit's motion was fully briefed, Carter filed a motion for leave to file a surreply and requested that the Court allow him to present his surreply to the Court verbally instead of in writing. The Court denied Carter's motion. Carter filed a motion asking the Court to reconsider its order. Finally, Carter filed a Cross-Motion for Summary Judgment. The Court has reviewed the record and the parties' pleadings and now rules as follows.

---

[9] *Carter v. Spirit AeroSystems, Inc.*, 2017 WL 4865690, at *6–7 (D. Kan. 2017).

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[10]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[11]  The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[12]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[13] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[14]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[15]

### B. Motion for Reconsideration

Under this district's local rules, a party may move the Court to reconsider a non-dispositive order based on: "(1) an intervening change in controlling law; (2) the availability of new evidence;

---

[10]  Fed. R. Civ. P. 56(c).

[11]  *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[12]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[13]  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[14]  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[15]  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

or (3) the need to correct clear error or prevent manifest injustice."[16] "A motion to reconsider is available when the court has misapprehended the facts, a party's position, or the controlling law, but it is not appropriate to revisit issues already addressed or to advance arguments that could have been raised in prior briefing."[17] "The decision whether to grant a motion to reconsider is committed to the district court's discretion."[18]

## III. Analysis

### A. Spirit's Motion for Summary Judgment

Spirit and Carter have each filed a motion for summary judgment. The Court elects to analyze Spirit's motion first. Spirit is seeking summary judgment on Carter's claims for ADA discrimination, FMLA interference, and ADA, FMLA, and workers' compensation retaliation.

#### 1. ADA discrimination

Carter has two surviving ADA discrimination claims against Spirit: one arises from his second suspension on June 11, 2015, and the other arises from his termination on July 21, 2015.[19] To evaluate ADA claims that lack direct evidence of discrimination, the Court uses the familiar *McDonnell Douglas* burden-shifting framework.[20] Under this framework, the plaintiff is first

---

[16] D. Kan. Rule 7.3(b)(1)–(3).

[17] *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 748 F. Supp. 2d 1261, 1264 (D. Kan. 2010) (citation omitted).

[18] *Id.*

[19] Carter's 2016 EEOC charge did not address his documented verbal warning, written warning or first suspension. Additionally, Carter has indicated that he is bringing ADA claims for discriminating against his wife's disability and for failure to accommodate his disability; however, Carter failed to address these arguments in his 2016 EEOC charge. To the extent Carter intends to bring an association discrimination claim or a failure to accommodate claim, Carter has failed to exhaust administrative remedies for such claims. Thus, Carter cannot proceed on such a claim here. *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018).

[20] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (relying on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

required to establish a prima facie case of discrimination by showing: (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that he was discriminated against because of his disability.[21] If the plaintiff makes this prima facie showing, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for its adverse employment decision.[22] Once the employer provides a satisfactory nondiscriminatory reason, the burden then shifts back to the employee to demonstrate that the employer's proffered reason is a pretext for discrimination.[23]

For the purposes of summary judgment, Spirit does not dispute that Carter is a disabled person under the ADA. Spirit argues, however, that Carter cannot demonstrate the second or third elements of a prima facie case. Under the second element, Carter must show that he was qualified, with or without reasonable accommodation, to perform the essential functions of his job. Spirit argues that regular and routine attendance—as well as the ability to timely notify his manager that he will be absent or late—are essential functions of Carter's job that he was unable to perform.

It is Carter's burden to show that he can perform the essential functions of his job.[24] It is uncontroverted that Carter's migraines interfered with his ability to attend work and to arrive at his job on time. It is also uncontroverted that Carter's migraines would manifest unpredictably and left Carter in so much pain that he was unable to make a phone call to inform his manager that

---

[21] *Id.*; *Melin v. Verizon Bus., Inc.*, 595 F. App'x 736, 738–39 (10th Cir. 2014).

[22] *Lincoln*, 900 F.3d at 1193 (citing *McDonnell Douglas*, 411 U.S. at 802).

[23] *Id.*

[24] *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (citation omitted).

he would be absent or late that day. Thus, the relevant issue is whether regular and routine attendance and the ability to follow Spirit's manager-notification policy are essential functions of Carter's job.

To be essential, a function must "bear more than a marginal relationship to the job at issue."[25] Rather, essential functions are "the fundamental job duties of the employment position."[26] The employer's judgment as to what functions are essential is given great weight.[27] The ADA does not require the Court to "second guess the employer's judgment when its description of those duties is job-related, uniformly enforced, and consistent with business necessity."[28] Neither does the ADA require an employer to lower company standards to accommodate a disabled employee.[29]

Spirit takes the position that regular and routine attendance at work is an essential function for all members of its production team, including the Assembly Mechanic-Underwing position that Carter held, and the Court gives considerable weight to Spirit's business judgment. Additionally, the Tenth Circuit has recognized that "physical attendance in the workplace is itself an essential function of most jobs."[30] Indeed, it hardly seems controversial that a job's essential functions would include consistently showing up to work, something Carter's migraines prevented him from doing. The record reflects—both in Carter's words and actions—that no accommodation

---

[25] *McDonald v. Raytheon Aircraft Corp.*, 959 F. Supp. 1415, 1422 (D. Kan. 1997).

[26] *Mason*, 357 F.3d at 1119; 29 C.F.R. § 1630.2(n)(1).

[27] *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009).

[28] *Winston v. Ross*, 725 F. App'x 659, 663 (10th Cir. 2018) (alterations omitted).

[29] *Mason*, 357 F.3d at 1119.

[30] *Punt v. Kelly Servs.*, 862 F.3d 1040, 1051 (10th Cir. 2017) (alteration omitted).

from Spirit would have allowed Carter to attend work and perform his job while he was experiencing a migraine episode. The record also reflects that Carter's migraines were not isolated or infrequent events: in his final six months of employment, Carter missed approximately 20% of his scheduled work hours because of his migraine condition.[31]

Additionally, Carter's migraines also prevented him from timely notifying his managers that he would be either late or absent from work, and it was Carter's failure to follow Spirit's manager notification policy (not his many absences themselves) that caused Spirit to repeatedly discipline and, ultimately, fire Carter. Spirit's manager-notification procedure is found in its Attendance and Punctuality policy, OP3-178, which states:

> In the event an unexpected circumstance arises that will cause the employee to be late for work or absent, the employee must notify his/her manager within the first thirty (30) minutes of their shift. Failure to follow these requirements may result in disciplinary action, up to and including termination.

Additionally, Spirit's General Leave of Absence policy, OP3-177, informs employees of the procedure they must follow to request and report leave under the FMLA. To have leave approved under the FMLA, the employee must notify Spirit's Benefits Center within three days of the absence. OP3-177 also states that "Employees must report absences and/or late arrivals in accordance with Spirit's OP3-178 *Attendance and Punctuality* procedure" and that "[n]othing in this procedure is intended to relieve an employee's responsibility to notify management or the Absence Reporting Line . . . of unscheduled absences and/or late arrivals in accordance with OP3-178."[32]

---

[31] During this same period, Carter was absent for other reasons as well. In total, Carter missed more than half of his regularly scheduled work hours.

[32] Carter focuses on the OP3-177's "is intended to" language and argues that this demonstrates that, although the policy is not *intended* to relieve an employee from complying with OP3-178's notification requirements, it may still provide that relief. The Court finds this argument unpersuasive and contrary to the clear intent of OP3-177. As

Rather than addressing whether following the manager-notification policy is an essential function of his former position, Carter disputes that OP3-178 applies to him at all. Instead, Carter argues that the only applicable rule governing his attendance is found in the CBA between IAM and Spirit. Section 11.4(C)(1) of the CBA addresses how sick leave may be used, and states that "[an] employee shall be paid for absence charged to sick leave and shall not be penalized for such absence providing the nature of the absence and anticipated length of absence is reported to his organization on the first day of such absence, or as soon thereafter as reasonably possible." Carter argues that Section 11.4(C)(1)'s "as soon thereafter as reasonably possible" requirement—not OP3-178's 30-minute requirement—applies to employees in his position. The Court disagrees.

As an initial matter, Carter is correct that OP3-178 states that the attendance guidelines "will be administered in accordance with the terms of the collective bargaining agreement." But OP3-178 also states that "[t]he following guidelines apply to *all Spirit AeroSystems employees* at the Wichita, Kinston, Tulsa, and McAlester sites." Additionally, Spirit provides a sworn declaration from Jeffry Black, who worked in Spirit's Labor Relations division in 2014–2015. According to Black, Section 11.4(C) "applies only to situations where the employee opts to use sick leave and wants to be paid for the absence." Black states that "[t]he 'notice of sick leave' provision in Section 11.4(C) is entirely separate and distinct from the manager notification procedure outlined in [OP3-178]." Additionally, Black states that in May 2015, Spirit and IAM entered into a Memorandum of Understanding ("MOA") confirming Section 11.4(C)(1) "was

---

Spirit correctly points out, the relevant section of OP3-177 begins by stating: "Employees *must* report absences and/or late arrivals in accordance with Spirit's OP3-178 (emphasis added)." The mandatory language informs the following sentence's statement that "[n]othing in this procedure is intended to relieve an employee's responsibility to notify management . . . in accordance with OP3-178." A plain reading of OP3-177 demonstrates that OP3-177 does not excuse noncompliance with OP3-178.

intended to cover use of sick leave credit, and that employees were still subject to discipline for failing to follow the manager notification procedure, even if they covered an absence with sick leave credit." Nothing in Section 11.4(C)(1) contradicts or nullifies OP3-178's requirement that *all* Spirit employees at the Wichita facility alert a manager within 30 minutes of a scheduled shift that the employee will be late or absent. Furthermore, Spirit and IAM's MOA confirmed that the manager-notification policy applies to Carter.

Having determined that Spirit's manager-notification policy applied to Carter, the next question is whether it is an "essential" function of Carter's job. Spirit argues that its manager notification policy is an essential function for all members of its production team. To support this contention, Spirit provides sworn declarations from three Spirit employees: Laura Breese, a Human Resources manager, Lauri Myers, a second-level supervisor, and Dustin Valentine, a first-level supervisor. Breese stated that "[t]he manager notification procedure ensures that first-level managers know at the beginning of the work day who will and will not be present for work." And both Myers and Valentine stated that for Spirit to meet its production deadlines, it is critical for managers to know which employees will be present on any given day. Additionally, Spirit has provided evidence that the manager-notification policy was uniformly enforced regardless of whether the employee's absence was excused.

Based on these uncontroverted facts, the Court concludes that the manager-notification policy was an essential aspect of Carter's job with Spirit. The policy was job-related, uniformly enforced, and consistent with business necessity. It is uncontroverted that because of his migraines, Carter was unable to consistently perform this essential function. Spirit twice engaged in an interactive dialogue with Carter to determine a reasonable accommodation that would allow Carter to comply with Spirit's manager-notification requirement. Spirit suggested several

solutions, including having a proxy call Carter's manager on his behalf during a migraine episode or having Carter call his manager the night before a shift if he thought a migraine might be forthcoming. Carter rejected that these suggestions would effectively allow him to comply with Spirit's policy; and the evidence shows that Carter proposed no alternative accommodation.

Although Carter provides no evidence that he ever requested a reasonable accommodation, Carter argues in his Response to Spirit's summary judgment motion that Spirit could have accommodated his disability by: (1) allowing Carter to work a "Flex" schedule[33] or (2) allowing Carter to work on the "third shift." In addition to the lack of evidence that Carter requested either accommodation (despite requests for input from Spirit), the Court discerns two additional flaws in Carter's proposal. First, based on the nature of Carter's disabilities, it is unclear how either accommodation would allow Carter to perform the essential functions of his job. Carter describes his migraines as being unpredictable and severely incapacitating, to such a degree that he is unable to even use his cell phone to call or send a text message to his managers. Even if Spirit allowed Carter the extra flexibility to arrive at work anytime from 4:30 a.m. to 8:30 a.m., the evidence does not show that this would solve Carter's inability to comply with the manager-notification policy. Although Carter was usually able to notify his managers he would be absent before 8:30 a.m., on at least one occasion Carter notified his manager he would be absent at 9:17 a.m., which would be untimely even under the more generous standard. Nor does Carter explain how working on the "third shift" would accommodate his disability.

---

[33] Carter does not support his definition of a "Flex" schedule with admissible evidence, but Carter states that "Flex is the term used when employees either start the[ir] shift before or after the[ir] stated shift start time leaning up [sic] 2 hours before shift start time and up to 2 hours after shift start time." Carter's Response also attached a copy of Spirit's Attendance Standards, which states that "Flexing of schedule, with prior management approval, is another option for short absences, such as doctor appointments."

Furthermore, even if working a flexible schedule would accommodate Carter's disability, the Court cannot conclude that such an accommodation would be reasonable. An accommodation that eliminates the essential functions of a job is not, as a matter of law, reasonable.[34] The evidence shows that the manager-notification policy is essential because Spirit's managers need to know which employees will be present or absent early in the day so that the workload can be distributed accordingly. Carter's proposed solution fails to take that into account. Instead, Carter's proposal fundamentally alters Spirit's manager-notification policy by extending his window to notify his manager from 30 minutes to 2.5 hours. Because Carter's proposed accommodation does not allow him to comply with Spirit's manager-notification policy but simply changes the underlying requirements, the Court cannot conclude that such an accommodation would be reasonable.

In sum, the uncontroverted facts show Carter was unable, with or without reasonable accommodation, to perform the essential functions of his job. Carter is thus unable to make a prima facie case of discrimination, so the Court will not consider the next two steps in the *McDonnell Douglas* test.[35] The Court grants Spirit summary judgment on Carter's ADA claims.

### 2. *FMLA interference*

The FMLA allows a qualified employee to take up to twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.[36] Additionally, the FMLA makes it

---

[34] *Mason*, 357 F.3d at 1122–23 (citations omitted).

[35] Because Carter was not qualified to perform the essential functions of his job, the Court need not consider Spirit's argument that Carter's cannot satisfy the third element of a prima facie case of ADA discrimination.

[36] 29 U.S.C. § 2612(a)(1)(D). The FMLA also allows the employee to take leave to take care of a spouse, child, or parent with a serious health condition. 29 U.S.C. § 2612(a)(1)(C).

"unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's FMLA rights.[37]  "To establish an FMLA interference claim, 'an employee must show that (1) he was entitled to FMLA leave, (2) an adverse action by his employer interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights.' "[38]

Here, the Court will assume, without deciding, that Carter adequately demonstrates the first two elements of an FMLA interference claim.[39]  Under the third element, an employer is not liable if it can demonstrate it would have taken the adverse action regardless of the employee's request for FMLA leave.[40]  The burden is on the employer to demonstrate "that the adverse decision was not related to the exercise or attempted exercise of the employee's FMLA rights."[41]  To meet this burden, "the employer is not required to show that the adverse employment decision and the employee's FMLA request are completely and entirely unrelated."[42]  For example, "if an employee's work-performance problems are related to the same illness that gave rise to FMLA

---

[37] 29 U.S.C. § 2615(a)(1).

[38] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 978 (10th Cir. 2017) (quoting *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012)).

[39] For purposes of summary judgment, Spirit does not dispute that Carter was entitled to FMLA leave. However, Spirit does challenge that it interfered with Carter's FMLA leave under the second element.

[40] *Nunez v. Lifetime Prod., Inc.*, 725 F. App'x 628, 631 (10th Cir. 2018) (citation and quotations omitted) (stating that an employer can defend against an FMLA interference claim "by showing that the employee would have been terminated anyway, i.e. regardless of the request for FMLA leave"); *DePaula*, 859 F.3d at 978–79 (upholding a district court's granting of summary judgment because the employer "demonstrated that [the employee] would have been terminated regardless of his request for, or taking of, FMLA leave"); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002) (citations omitted) (stating that "an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request").

[41] *See Dalpiaz v. Carbon Cty., Utah*, 760 F.3d 1126, 1132 (10th Cir. 2014) (citation, alterations, and quotations omitted).

[42] *Id.*

leave, the employee may still be terminated based on his work-performance problems, regardless of the indirect causal link between the FMLA leave and the adverse decision."[43]  Furthermore, Tenth Circuit precedent is clear that an employer is permitted to enforce its absence-notification policies even when an employee's absence is covered by the FMLA; and an employee's failure to comply with the employer's absence-notification policy is acceptable grounds for discipline, including termination.[44]

For example, in *Bones v. Honeywell*, the Tenth Circuit affirmed a district court's order granting summary judgment to an employer who fired an employee for missing three consecutive workdays.[45]  The employee submitted a request for FMLA leave to the employer's medical department, but she failed to notify her department or supervisor that she would be absent.  Under the employer's policies, this was grounds for termination.  In affirming summary judgment, the Tenth Circuit explained:

> [The employee] was terminated because she did not comply with [the employer's] absence policy; *she would have been terminated for doing so irrespective of whether or not these absences were related to a requested medical leave.*  [The employee's] request for an FMLA leave does not shelter her from the obligation, which is the same as that of any other [] employee, to comply with [her employer's] policies, including its absence policy.[46]

Subsequently, in *Twigg v. Hawker Beechcraft*, the Tenth Circuit stated that "even if the FMLA entitles an employee to be absent from work, the employee's violation of a notice-of-absence policy can constitute a reason for dismissal that is unrelated to a request for an FMLA

---

[43] *Id.* (citations omitted).

[44] *Branham v. Delta Airlines*, 678 F. App'x 702, 705 (10th Cir. 2017); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1008–09 (10th Cir. 2011); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004).

[45] *Bones*, 366 F.3d at 872.

[46] *Id.* at 878 (emphasis added) (internal citations omitted).

leave."[47]   The court reasoned that "[f]ormal notice-of-absence policies serve an employer's legitimate business interests in keeping apprised of the status of its employees and ensuring that it has an adequate workforce to carry out its normal operations."[48]

Here, Spirit has adequately demonstrated that Carter would have been fired whether his absences were excused by the FMLA or not.  The uncontroverted evidence shows that Carter was disciplined and eventually fired because of his repeated violations of Spirit's manager-notification policy.  Carter was repeatedly informed that continuing to violate this policy could lead to his employment being terminated; and, despite Spirit's efforts to find a solution that would allow Carter to adhere to this policy, Carter was unable to do so.  The Court holds, based on Tenth Circuit precedent, that Spirit was entitled to enforce its manager-notification policy irrespective of whether Carter's absences were approved under the FMLA.  Because the Court holds that Spirit adequately demonstrated that Carter would have been fired regardless of whether he requested leave under the FMLA, Spirit is entitled to summary judgment on Carter's FMLA interference claim.

*3.    Retaliation*

Carter raises retaliation claims under the ADA and the FMLA; he also brings a state law claim for workers' compensation retaliation.  All three of Carter's retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[49]   The Court recognizes that the elements necessary to make a prima facie case for a retaliation claim under the ADA and FMLA differ slightly from the elements in a workers' compensation claim.  However, even assuming

---

[47] 659 F.3d at 1009 (relying on *Bones*).

[48] *Id.*

[49] *Smith v. Millennium Rail, Inc.*, 241 F. Supp. 3d 1183, 1204 (D. Kan. 2017) (citations omitted).

Carter can make a prima facie case of retaliation under any of his theories, the Court concludes that Carter cannot demonstrate that Spirit's legitimate nondiscriminatory reason for suspending and firing Carter was pretext for discrimination.

Spirit asserts that it suspended and fired Carter for failing to abide by Spirit's manager-notification policy. To defeat summary judgment, an employee "must show that there is a genuine dispute of material fact as to whether [the employer's] explanations for [the adverse action] are pretextual."[50] In asserting pretext, the employee must discredit the nondiscriminatory reason advanced by the employer; this can be done by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons."[51] Another option is to provide "direct evidence discrediting the proffered rationale" or to show "that the plaintiff was treated differently from others similarly situated."[52] Although temporal proximity between the protected activity and the adverse action is a factor in showing pretext, temporal proximity is by itself insufficient to defeat summary judgment.[53]

Here, Carter argues that "[he], throughout this litigation, has shown that [Spirit's] stated reason for [its] employment decisions were pretext for retaliation." Although Carter's arguments are scattered throughout his Response, the Court gleans two arguments that Carter appears to rely on in arguing that Spirit's proffered justification was pretextual. First, Carter highlights that all his discipline problems occurred after he filed his complaint with the EEOC in 2014, and Carter

---

[50] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (citations omitted).

[51] *Smith*, 241 F. Supp. 3d at 1199–200 (citations and quotations omitted).

[52] *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012).

[53] *Baughman v. Yellow Book USA, Inc.*, 2009 WL 10689045, at *14 (D. Kan. 2009) (citing *Annett v. University of Kansas*, 371 F.3d 1233, 1240–41 (10th Cir. 2004)); *see also Metzler*, 464 F.3d at 1172.

argues that before he filed his 2014 EEOC charge the "common shop practice" was to not enforce Spirit's manager-notification policy. Second, Carter argues that other Spirit employees who are still employed by the company were absent from work "just as much" or "more frequently" than Carter.

Carter's first argument relies on the temporal proximity between his protected activities and Spirit's adverse actions. Carter argues that the "common shop practice" was to not enforce OP3-178's notification requirements and that this practice changed after he filed his charge with the EEOC in October 2014.[54] While temporal proximity is an appropriate factor for the Court to consider, it alone is insufficient to conclude that Carter has met his burden to show pretext. Rather Carter must produce additional evidence that Spirit's legitimate reason is unworthy of belief, and the Court concludes that Carter has failed to meet his burden. Additionally, Carter's argument that the "common shop practice" was to not enforce the manager-notification policy is contradicted by the overwhelming and uncontroverted evidence Spirit provided showing that Spirit enforced this policy against nearly 200 employees from 2014–2015, many of whom were disciplined before Carter filed his charge with the EEOC.

In addition to temporal proximity, Carter also argues that other Spirit employees were absent with equal or greater frequency than Carter but remained employed by Spirit. This argument, however, is unpersuasive for at least two reasons. First, Carter provides no evidentiary basis for his claim that other employees were absent with equal or greater frequency. Second, Carter's claim—even if true—is immaterial. Carter was not disciplined for the absences

---

[54] Carter makes no temporal proximity arguments in relation to his FMLA or workers' compensation retaliation claims.

themselves but rather for the failure to notify his manager that he would be absent.  Assuming that Carter is correct that some of his coworkers tallied a higher number of absences, this says nothing about whether those coworkers complied with Spirit's manager-notification policy.  Spirit never disciplined Carter for an excused absence provided he gave his manager timely notice.  Thus, this allegation, even if supported by evidence, does not show that Carter was treated differently or worse than similarly situated coworkers.

Further undermining Carter's claim that Spirit's proffered reason was pretextual, the Court notes that Carter received his first suspension for violating the manager-notification policy on February 9, 2015.  Within a week of returning from his suspension, Carter left work in the middle of a shift without notifying his manager.  Because Carter had already received progressive discipline, Carter's mid-shift departure would have been grounds for Spirit terminating his employment.  Yet Spirit agreed not to discipline Carter for this incident.  Similarly, on June 11, 2015, Spirit disciplined Carter again for failing to follow the manager-notification policy on April 14, 2015 and on May 20, 2015.  Once again, rather than terminating Carter's employment, Spirit opted for a lesser punishment and gave him a second suspension.  Both Carter's mid-shift departure and his second suspension occurred long after Carter filed his workers' compensation claim, 2014 EEOC charge, or many requests for FMLA leave.  Spirit providing Carter additional opportunities to keep his job is inconsistent with Carter's assertion that Spirit's motives were retaliatory rather than legitimate.  The Court concludes that Carter cannot meet his burden to show pretext, and Spirit is therefore entitled to summary judgment on each of Carter's retaliation claims.

In sum, the Court concludes that Spirit is entitled to judgment as a matter of law on all Carter's claims:  ADA discrimination, FMLA interference, and retaliation.  Because of these

rulings, the Court need not consider Carter's cross-motion for summary judgment and denies it as moot.

## B. Carter's Motion for Reconsideration

As a final matter, Carter previously requested the Court's leave to file a surreply and requested that the Court allow him to present his surreply to the Court verbally instead of in writing. The Court denied that motion.[55] Carter now moves the Court to reconsider its ruling, arguing that it was "clear error" for the Court to deny his request because Spirit, in its Reply brief, cited nine new cases.[56] Carter argues that the Court "must allow Plaintiff the opportunity to respond by oral argument to the Defendant's *nine* new arguments and new evidence improperly raised in its Reply brief."[57]

This Court's local rules contemplate only the filing of responses and replies to motions.[58] Surreplies are disfavored and will be permitted only in exceptional circumstances, such as when new material is raised for the first time in the movant's reply.[59] New "material" in a reply includes both new evidence and new legal arguments.[60] However, citing new cases to support legal theories already raised in a summary judgment motion is permissible and does not warrant a surreply.[61]

---

[55] *See* Doc. 164.

[56] Doc. 165 at 1.

[57] *Id.* at 1–2.

[58] *See* D. Kan. Rule 7.1(c).

[59] *See Locke v. Grady Cty.*, 437 F. App'x 626, 633 (10th Cir. 2011); *Dale v. Beechcraft*, 2014 WL 853028, at *2 (D. Kan. 2014).

[60] *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005).

[61] *See In re Motor Fuel Temperature Sales Practices Litig.*, 2011 WL 5506259, at *2 (D. Kan. 2011) (stating that "two cases first cited in defendants' reply do not constitute new legal argument" because they "stand for the very same proposition as the cases cited in defendants' original motion").

Additionally, "[a] reply which merely responds to matters placed in issue by the response, and 'does not spring upon the opposing party new reasons for the entry of summary judgment' is entirely proper."[62] For example, this Court has held that if a plaintiff's response fails to comply with the Rules of Federal Procedure, a defendant's reply may properly highlight the deficiencies in the plaintiff's response without opening the door to additional pleadings from the plaintiff.[63]

Here, Carter takes issue with nine cases included in Spirit's Reply that Spirit did not cite in its Motion for Summary Judgment. But citing new legal authority is not synonymous with raising new legal arguments. Upon review of the nine additional cases cited in Spirit's Reply, the Court concludes that Spirit merely replied to the arguments raised in Carter's Response and pointed out deficiencies in Carter's Response, including Carter's failure to follow the Court's procedural rules. These are acceptable uses for a reply and do not constitute new material that would require additional pleadings. Thus, the Court discerns no reason to set aside its earlier ruling and Carter's motion for reconsideration is denied.[64]

---

[62] *Vonlintel v. Eagle Commc'ns, Inc.*, 2015 WL 5093271, at *1 (D. Kan. 2015).

[63] *Kling v. Beck*, 2011 WL 4553087, at *1 (D. Kan. 2011).

[64] Even if a surreply would have been appropriate in this case, Carter's motion would still have been denied. As Carter's original motion acknowledged, Carter is noncompliant with the local rules governing a party's request to file a surreply. Under D. Kan. Rule 15.1(a)(2), Carter was required to attach a copy of his proposed surreply to his motion and he failed to comply with that rule. The Court notes that Rule 15.1(a)(2)—and Carter's noncompliance with that rule—has previously been at issue in this case. *Carter v. Spirit AeroSystems, Inc.*, 2017 WL 4865690, at *4 (D. Kan. 2017). Carter's motion for leave to file a surreply explained that Carter did not did not attach a copy of his surreply because he "believes verbally arguing his opposition would be more appropriate." Indeed, at multiple times during this litigation Carter has expressed a preference for making his arguments verbally instead of in writing. However, Carter is required to follow this Court's procedures, which includes making his legal arguments in written pleadings. Carter's belief that it would be preferable or "more appropriate" to present his surreply verbally instead of in writing does not factor into this Court's decision; neither does it excuse his noncompliance with this Court's local rules. Failure to comply with Rule 15.1(a)(2) would have been an additional, independent reason for the Court to deny Carter's request.

**IT IS THEREFORE ORDERED** that Defendant Spirit AeroSystems, Inc.'s Motion for Summary Judgment (Doc. 149) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Mark Anthony Carter's Cross-Motion for Summary Judgment (Doc. 166) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Mark Anthony Carter's Motion for Reconsideration (Doc. 165) is **DENIED.**

**IT IS SO ORDERED**.

This case is now closed.

Dated this 8th day of August, 2019.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE